Pasteur et al. vs. Lewis and Lynd.

## No. 9762.

### Francis J. Pasteur et al. vs. R. N. Lewis and Wm. Lynd.

Where in a motion for an appeal the return day is left in blank and the judge on his own motion fills up the blank with an illegal return day, the irregularity will not be imputed to the fault of the appellant.

State courts have the right to examine collaterally into the alleged defects of judgment rendered by United States courts of original and limited jurisdiction, when such judgments are made the basis of litigants' titles  But the inquiry must be restricted to an examination to ascertain whether the court which rendered the judgment had jurisdiction and whether it exercised that jurisdiction according to the forms of proceeding established by law.

The inquiry into the facts must be restricted to test the verity of allegations as to domicile or citizenship, necessary to give jurisdiction.  Want of jurisdiction may be shown either as to the subject-matter or the person, or in proceedings *in rem* as to the thing.  18 Wallace, 457, Thompson vs. Whitman.

No inquiry can be made as to the correctness of the judgment upon the merits.

In dealing with such questions, arising out of proceedings instituted under the Act of Congress, providing for the confiscation of property used for insurrectionary purposes, State courts must be guided by the rules of Common law as expounded by the Supreme Court of the United States, and not by local laws, unless the latter harmonize with Federal jurisprudence.

In a Common law proceeding *in rem* for the condemnation of property seized under the statute, the monition published is a citation on all interested persons, who are thus made parties to the action—and after a default there is no necessity for a jury trial.  11 Wallace, 303; 20 Wallace, 110.  Alien enemies have the right to appear and defend their rights in a court of justice when cited therein.  93 U. S., 283.

APPEAL from the Civil District Court for the Parish of Orleans.  *Houston*, J.

*J. P. Childress, Merrick & Merrick* and *Albert Voorhies* for Plaintiffs and Appellants.

*Bayne & Denègre* for Defendants and Appellees.

### On Motion to Dismiss.

The opinion of the Court was delivered by

Todd, J.  The ground of this motion is that the appeal was made returnable to this Court on the first Monday in June, 1886, a day when the Court was not in session in this city.  It is charged that the return

day was suggested by the appellants' counsel, and therefore that the illegal return day was imputable to the fault of appellants.

The order for the appeal was rendered on the petition of appellants; and from the copy of the petition in the transcript it would appear that the suggestion of the return day was made by the appellants' counsel, since that day is mentioned and written in the body of the petition.

It is, however, denied by the counsel of appellants that such was the fact. They state that the petition for the appeal was prepared and signed by them, but that blanks were left therein for the return day and the amount of the appeal bond, and the return day was fixed by the judge *a quo* on his own motion,—and this is sworn to. They have further caused the original petition and order of appeal to be brought up to this Court, which fully verify their statement and affidavit. They admit that after the order for the appeal was signed they filled up the blanks in their petition to correspond with the order of the court.

Under these circumstances we do not think that the irregularity charged can be imputed to the fault of the appellants. It was the act of the judge.

The motion to dismiss is therefore denied.

### ON THE MERITS.

POCHÉ, J. This is a petitory action by which plaintiffs claim the ownership of a portion of a piece of valuable property, known as the " Tyler " or " Virginia cotton press," situated in this city.

In their original petition they claim as heirs of their father, R. M. Pasteur, who is alleged to have been at his death, in 1874, the lawful owner of one undivided half of the property which is now held by defendants, as purchasers through mesne conveyances, under a title derived through a condemnation and a sale of the property in execution of a judgment rendered by the Circuit Court of the United States for the Eastern District of Louisiana, under the provisions of the Act of Congress of the 6th of August, 1861, entitled " an act to confiscate property used for insurrectionary purposes."

In that petition, the judgment of condemnation and the sale made thereunder, are alleged to be absolutely null and void. for the main reason that the court which rendered the judgment was without jurisdiction, and for other alleged fatal defects in the proceedings.

In a supplemental petition, plaintiffs press their claim as heirs of their mother, who had died in January, 1863, and on the averment that her share in the community to which the property belonged, could not

have been affected by the judgment of condemnation, they reiterate their allegations of nullity of the proceedings as contained in their original petition.

They prosecute this appeal from an adverse judgment.

A statement of the salient pertinent facts disclosed by the record, will be useful to a proper appreciation of the defense and of the issues which must be determined in this opinion.

R. M. Pasteur, who died in March, 1874, had been twice married. Francis I. Pasteur, Alice Pasteur and Georgiana Pasteur, wife of W. E. Kirk, all of age, are the issue of his first marriage, and are the plaintiffs in this suit.

His second marriage was with Mary E. Kirk, from whom he had three children, yet minors, namely Effie May, Mary Kirk and Sallie Katie Pasteur.

The present suit was instituted on the 16th of February, 1881.

Now, on the 24th of May, 1881, a suit was brought in the Circuit Court of the United States for Louisiana, on behalf of the minor children, issue of the second marriage of R. M. Pasteur, by their tutrix, to recover their father's share of the property, on the main ground that as a life estate only had been disposed of by the condemnation proceedings, the title to the fee had reverted to Pasteur's heirs at law at his death.

The Circuit Court held that under the act of August, 1861, the fee itself had been conveyed to the purchaser at the confiscation sale, and those views were sustained by the Supreme Court of the United States, which affirmed the judgment rendered below in favor of the defendants.

Among other grounds of resistance urged by the defendants in the present suit, by way of exception and answer, it is contended that the validity of the judgment of condemnation and forfeiture rendered by the Circuit Court of the United States cannot be inquired into collaterally, and that the principal issues presented here have been disposed of and are covered by the decision of the Supreme Court of the United States, in the suit brought against these defendants by the tutrix of the minor heirs of R. M. Pasteur, to be found in the 106th volume of United States Reports, p. 315.

There is, and there can be, no serious dispute as to the right of all courts to examine collaterally into the alleged defects of judgments which are made the basis of litigants' titles, and as to the extent of such an examination.

The rule seems to be well established, both in our jurisprudence and

in that of the Supreme Court of the United States, that such an inquiry must be restricted to the right of ascertaining whether the court which rendered the judgment had jurisdiction, and whether it exercised that jurisdiction according to the forms of proceedings established by law.

The same rule applies to all inquiries of this nature, whether between courts of the same State, or between State courts and Courts of the United States.

In the case of Lowry vs. Erwin, 6 Rob. 203, this Court, in dealing with an exception which denied the right of a State court to question, under any circumstances, the validity of a judgment of a Court of the United States, used the following language: "We admit that neither this tribunal nor the inferior courts can revise a judgment of the United States Court, upon the merits. We cannot say whether it was rendered upon proper evidence or is correct in itself; but we do say and have so decided recently that when the proceedings of the Federal Courts are set up as the basis of title between persons litigating in our courts, that then we will look into their proceedings, for the purpose of seeing whether they have jurisdiction or authority to render such judgment or decree." Garrard vs. Reed, 5 Rob. 506.

Under that principle the court considered evidence to prove the real domicile of a party, contrary to the allegations on which the Federal Court had rested its jurisdiction.

But on a writ of error in the Supreme Court of the United States, the right of making that inquiry was denied to the State court, and the following principle was announced: "If the record contains proper averments of citizenship to give a Circuit Court of the United States jurisdiction, a title made by the marshall under the judgment cannot be attacked collaterally by proof that the averments of citizenship were not true, and so that the court had not jurisdiction." Erwin vs. Lowery, 7 Howard 178.

Subsequently, however, this rule received a very material modification at the hands of that exalted tribunal, in the case of Thompson vs. Whitman, 18 Wallace 457. The rule as modified stands thus: "The record of a judgment rendered in another State may be contradicted as to the facts necessary to give the court jurisdiction; and if it be shown that such facts did not exist, the record will be a nullity, notwithstanding it may recite that they did exist.

"Want of jurisdiction may be shown either as to the subject-matter or the person, or in proceedings *in rem* as to the thing."

The status of the person, when it involves the question of jurisdic-

tion, can therefore be inquired into collaterally, even when the pleadings contain the averments necessary to vest jurisdiction.

Guided by these principles, which go to as great an extent as plaintiffs could possibly contend for, we propose now to discuss the three grounds of nullity which they plead to the judgment of condemnation and forfeiture which is held up by defendants as the basis of their title.

Their attack may be summarized thus:

1. Want of jurisdiction, because the court tried the questions of fact without a jury —the seizure having been made on land, and not falling within admiralty practice.

2. That the owners, who were minors residing within an insurrectionary district, were debarred all hearing in the premises.

3. Defective description of the property seized.

I.

On the question of jurisdiction, we premise by stating that we do not understand plaintiffs to question the competency of the Circuit Court in the premises, or its jurisdiction of the thing seized in a proceeding admitted to have been *in rem*.

The record shows that the seizure was made in all respects in compliance with the provisions of the Act of Congress of the 6th of August, 1861, and with the forms of proceeding required by Federal jurisprudence in such cases.

Section 2 of the Act reads: " Such prizes shall be condemned in the District or Circuit Court of the United States having jurisdiction of the amount, or in admiralty in any district in which the same may be seized, or into which they may be taken and proceedings first instituted."

This section has been uniformly construed by the Supreme Court of the United States, to mean that in cases where property is captured at sea or on water, such as navigable streams, the course of admiralty may be strictly observed; but as to seizures on land, the proceeding must be at common law and *in rem*.  6 Wallace, 764, Union Insurance case; same, 769, Armstrong's foundry; 8 Wallace, 511, Morris Cotton; 11 Wallace, 303, Miller vs. United States; 20 Wallace, 109, Confiscation cases.

But plaintiffs' contention, as we understand it, rests on that very distinction, and is to this effect, that the whole proceeding was made to conform to admiralty rules, when it should have been at common law, and that the court was incompetent to try the questions of fact without a jury.

The two questions of fact involved were: 1st. The allegations that

the property had been used for insurrectionary purposes since the publication of the President's proclamation required by the Act of Congress of the 6th of August, 1861. 2d. The consent of the owners to such use of their property.

The process of substituted citation was by monition, posted and publised in a newspaper, calling on the owners or other parties interested to show cause why the condemnation should not be made final. Nearly two years after such notice, no appearance having been made, a default was entered against the owners, and the libel adjudged and taken *pro confesso*.

Just such a proceeding has several times been recognized by the Supreme Court of the United States as a proceeding *in rem* at common law, and the default as thus entered as dispensing with a trial by jury.

In Miller's case, 11 Wallace 303, the Court said : " The third assignment is that as the proceedings related to seizure on land the case was one of common law jurisdiction, and there should have been a trial by jury; and we are referred to Union Insurance Co. vs. United States, Armstrong's Foundry, and other kindred cases. But in this case there was a default. After default there was no fact to be ascertained. The province of a jury in suits at common law is to decide issues of fact, when there are no such issues there can be nothing for a jury to try. The assignment is therefore without merit. None of the cases cited go further than to hold that issues of fact on the demand of either party must be tried by jury."

The fact that the proceeding began by a libel, and that citation was substituted by a monition, did not divest it of its character of a common law proceeding, or remove the case from the common law, to the admiralty, jurisdiction of the court.

In a precisely similar case the Supreme Court of the United States held : " No doubt in cases of seizure upon land, resort should be had to the common law side of the court, and such in substance was, we think, the case here. Everything necessary to a common law proceeding *in rem* is found in the record. An information was filed, (called a libel of information, it is true, but still an information), * * * a monition was issued, a default was taken, and, after consideration of the evidence, condemnation was adjudged. What was lacking in this to a common law proceeding *in rem ?* The principal lack alleged is that there was no jury trial. But in courts of common law no jury is called when there is no issue of fact to be tried." 20 Wall. 110. Confiscation cases.

The principles of those two decisions afford a complete refutation to

the double argument that the proceeding was in the admiralty juris-
diction of the court, and that the failure of ordering a jury trial was
a fatal defect.

The question of jurisdiction is thus settled in favor of the validity
of the judgment assailed here by plaintiffs.

## II.

The argument on their second proposition is in substance that, as
they were then residing out of the State of Louisiana, and in an insur-
rectionary district, they could not be reached by a monition, and that
even if thus notified, they were forbidden by the President's procla-
mation of non-intercourse, from appearing and pleading in the court
which had seized their property.

The first part of this argument finds its answer in the very nature of
a published monition in a common law proceeding *in rem*, which is a
citation on, and which makes parties to the suit, all persons who could
have asserted a right to or in the property libelled.   4 La. 85, Bandue's
Syndicate vs. Nicholson;  McVeigh vs. United States, 11 Wall. 266 ;
Window vs. McVeigh, 93 U. S. 283.

The second part of the argument is answered by the two last de-
cisions quoted, in which an alien enemy was recognized the right of
pleading in a court in which he had been cited by process of monition.
The Court said :   " It is alleged that he was in the position of an alien
enemy and hence could have no *locus standi* in that forum.   If assailed
there he could defend there."   11 Wall. 267.

So with the plaintiffs in this case, who could not have been denied a
hearing if they had appeared in court at any time before the judgment
of condemnation was pronounced.   That judgment was not rendered
before the 30th of November, 1865, and we take judicial cognizance of
the historical fact that for several months previous, free communica-
tion had been opened between the city of New Orleans and the States
of Mississippi and Georgia, where plaintiffs were severally sojourning
at the time that the monition was published.

## III.

The alleged deficiency of the description of the property libelled
is surely not a point of attack which can be considered collaterally.
The plainest text of the rule which we have considered as established
excludes that complaint from our consideration.   This leaves but the
point made on the community rights of plaintiffs' mother.

A very plain answer is suggested to that contention.   If, at the time
that the proceedings were instituted, plaintiffs had acquired any rights

to the property which they could have successfully set up before the Circuit Court, they were included in the monition as published.

It contained no names, but called on all parties who had any interest in and to the property libelled to appear and defend their rights. Hence it would have included these plaintiffs or their mother. Therefore, the default when rendered concluded them under their alleged rights which even therefore and for that reason were included in the condemnation.

If such rights were not included in the proceedings, it is simply and only because they did not exist; and in that case plaintiffs have no complaints to urge or maintain in this proceeding.

We have read with interest the learned disquisition on the rights of married women to an interest in the community existing between the spouses under the laws of Louisiana presented by plaintiffs' counsel, but we find no warrant for an attempt on our part to inject any of the principles of civil law in a discussion involving exclusively a legislation emanating from the war power of the Government of the United States. To properly construe such a law, and to legally apply its intended effects, reference must be made exclusively to that system of laws and jurisprudence to which the law-maker looked as the only channel of its execution.

Hence we have deemed it our bounden duty in the determination of the issues which we considered to be within our judicial grasp, in this controversy, to seek for our land-marks among the decisions of the Supreme Court of the United States.

Under their guidance, we learn that proceedings, under the legislation which we are considering, were in the strictest sense of the term, common law proceedings *in rem*, in which the property captured or seized was the principal factor, and in which the person or personal rights of the owner were entitled to no further attention or consideration than was required to prove the owner's consent to the use of his property for insurrectionary purposes.

In the case of Kirk vs. Lynd, 106, U. S. Reports, p. 316, the case to which we referred in the beginning of this opinion, and in which the court dealt with the very judgment now under discussion, we find the following language: "All private property used, or intended to be used, in aid of an insurrection, with the knowledge or consent of the owner, is made the lawful subject of capture and judicial condemnation, and this, not to punish the owner for any crime, but to weaken the insurrection. The offense for which the condemnation may be decreed is one that inheres in the property itself, and grows out of the

fact that the property has become, or is intended to become, with the approval of its owner an instrument for the promotion of the ends of the insurrection.   *   *   *   The property is the offending thing, and condemnation is decreed  because its owner has voluntarily allowed it to become involved in the offense.   *   *   *   Property captured in war is not taken to punish its owner any more than the life of a soldier slain in battle is taken to punish him.   The property as well as the life is taken only as a means of lessening the warlike strength of the enemy."

In rendering the judgment of condemnation, the court must have been satisfied from the proof adduced, that the libelled property had been used for insurrectionary purposes with the knowledge or consent of its owner.

In dealing with a collateral attack on the judgment thus rendered, we have no warrant to ascertain whether it rested on sufficient evidence, or whether the court took into consideration the alleged community rights of Mrs. Pasteur, or those of her children after her death. Our inquiry is limited ; it cannot be extended to an examination of the judgment as to its correctness under the evidence.

We, therefore, conclude that the proceedings assailed have withstood plaintiffs' attack, and that in this suit at least, the defendant cannot be disturbed either in their ownership or in their possession.

After reaching that conclusion, and as we glance over the field of discussion, we find no little relief in the thought that our researches must have followed the same channel which had been traced by the Supreme Court of the United States, in their decision to which we have just referred.

As the parties were not the same, and the issues presented were not *all* the same, the  judgment in that case was not a legal bar to the discussion of the issues which were presented to us.   As stated, the salient issue in the case of Kirk vs. Lynd, was the nature of the title which the forfeiture had conveyed, unaccompanied, as in this case, by an attack on the validty of the proceedings.   But it is, nevertheless, certain that the Supreme Court of the United States could not have been induced to decide that the purchaser had acquired a title to the fee under the condemnation, if the record, (the same which has been filed here), had disclosed fatal defects patent upon its face.   Of necessity and in justice, the Court, before judicially determining the effect of the judgment of forfeiture, must have ascertained that there was a judgment valid in law, rendered by a competent court, having and exercising vested and legal jurisdiction in the premises.   This is pre-

cisely what was done, as shown by the following summary of the case which we extract from the opinion of the Court. After stating that the condemnation must be pronounced by the appropriate judicial tribunal, and that thence flows a complete title, the Court said:

"The title acquired by the purchaser in this case was of that kind. The property bought had been seized under the authority of the statute as property used in aid of an insurrection against the United States with the consent of its owner. The fact of hostile use with the owner's consent was established, and the requisite sentence of judicial condemnation was entered. In this way the title of the United States by capture was perfected. That title as against the owner and his heirs was the fee. The defendants below, who are the defendants in error here, have succeeded to that title."

It is true that the law is a harsh one, but it was a war measure, and the mission of courts is to expound the law, and not to avert its rigorous effects.

In this case, however, there is no feature of unjust hardship to the expropriated owners.

The property sold for $53,500, of which $48,978.47 were paid over to the mortgagee with a vendor's lien, whose claim amounted then to $101,013.80.

The fact was apparent to, and acknowledged by, R. M. Pasteur who intervened in one of the sales made under the title thus acquired, and ratified the same with full knowledge of all the facts.

The judgment appealed from is therefore affirmed with costs.

Rehearing refused.